IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  37390-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSE JESUS ESPINOZA, JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Jose Jesus Espinoza Jr. appeals convictions for third degree assault, unlawful possession of a firearm, and witness tampering.

Mr. Espinoza's girlfriend was shot by the apparently accidental firing of a handgun that the jury could reasonably find, beyond a reasonable doubt, was in the possession of Mr. Espinoza.  But the State presented limited evidence that the shot was fired negligently rather than nonnegligently, and defense counsel provided ineffective

assistance of counsel when he failed to object to the prosecutor's argument in closing that Mr. Espinoza was not entitled to the benefit of doubt.

We reverse Mr. Espinoza's conviction for third degree assault with its firearm enhancement, affirm Mr. Espinoza's convictions on the remaining counts, and remand.

FACTS AND PROCEDURAL BACKGROUND

On a late afternoon in July 2019, Jose Jesus Espinoza Jr. rushed his girlfriend, Blanca Perez, to Samaritan Hospital in Moses Lake. She had a gunshot wound in her back. Admitting clerks who saw Mr. Espinoza approaching, screaming that he needed help, unlocked electronic doors so he could enter the emergency room (ER), where medical staff assumed responsibility for Ms. Perez. When Mr. Espinoza ran out of the ER and past the clerks, they yelled at him to stop and provide information about the patient, but he continued running, saying he had to move his car. A few minutes later, ER staff informed the admitting clerks that the patient had a gunshot wound. One of the clerks notified police.

Moses Lake police officers responded quickly and were at the hospital reviewing surveillance video when Mr. Espinoza returned about 25 minutes later. Officer Tyler St. Onge and Reserve Officer Roland Alejo were notified of his return and traveled to the admitting area to speak with him. At the request of admitting clerk Junelle Monk, the officers stood several feet away while she obtained basic information from Mr. Espinoza for Ms. Perez's admission. Officer St. Onge's body camera captured Mr. Espinoza

2

sitting at the admitting desk, answering intermittent questions from Ms. Monk while at the same time placing calls and speaking in Spanish on his phone. Officer St. Onge would later describe Mr. Espinoza as upset, emotional, frantic, sweating, and speaking extremely fast. Officer Alejo, whose native language is Spanish, heard Mr. Espinoza tell whoever he was speaking with on the phone to get a hold of his girlfriend's parents and come to the hospital because there was an accident.

After the admission information was obtained, Mr. Espinoza spoke to Officers St. Onge and Alejo. Mr. Espinoza spoke freely but rapidly, and his description of events was not always clear. Asked what had happened, Mr. Espinoza said he and a couple of Ms. Perez's friends "were inside cleaning up, he is bending down cleaning up some items on the floor when he heard a loud pop and looked back and his girlfriend had fallen to the floor." Report of Proceedings (RP) at 236. Later in his conversation with officers, Mr. Espinoza said Ms. Perez's friends left before Mr. Espinoza heard the bang and he and Ms. Perez were the only ones in the house. Mr. Espinoza told the officers there were no guns in the house and he could not own guns.

The officers allowed Mr. Espinoza to go into the trauma room where Ms. Perez was in a bed, crying but not seriously injured. Dr. Jay Kovar, the attending physician, had confirmed that two wounds on her torso were entrance and exit wounds from a single bullet, which had not struck any organs.

3

The officers stood by while Mr. Espinoza spoke with and comforted Ms. Perez. Like their interview of Mr. Espinoza, this was captured on Officer St. Onge's body camera.

Ms. Monk and her coworker Sherry Jensen, who was sitting next to Ms. Monk as she obtained information from Mr. Espinoza, were puzzled that Mr. Espinoza was being permitted to see Ms. Perez. Both had heard Mr. Espinoza say that he shot her. Ms. Monk would later testify that when she asked Mr. Espinoza what happened to Ms. Perez, he said, "I shot her, it was an accident." RP at 193. Ms. Jensen would later testify that she heard Mr. Espinoza say "that he was standing in his kitchen and he was handling his gun and then he heard the loud shot and realized he had shot the patient." RP at 209.

Ms. Monk or Ms. Jensen notified the security guard that Mr. Espinoza had admitted shooting Ms. Perez and the guard passed the information along to Officers St. Onge and Alejo. Neither officer had heard Mr. Espinoza make these statements while they stood nearby during the admitting process.

The officers retrieved Mr. Espinoza from the trauma room and handcuffed him. Mr. Espinoza immediately demanded to know what they were doing and why, and they said that they were going to take him outside where they would explain. When he asked if he was being arrested, they said he was being detained, based on new information. Mr. Espinoza asked what the new information was, and they refused to tell him until he listened to his rights and agreed to speak with them.

4

When told what the admitting clerks had reported, Mr. Espinoza said they must have misunderstood him because he was hysterical. He repeatedly denied shooting Ms. Perez and even laughed at the accusation. When reminded by the officers that he said he and Ms. Perez were the only people in the house when she was struck, Mr. Espinoza said he was only "pretty sure" he and Ms. Perez were the only people in the house; he was just guessing. Ex. 1 (Clip 2, St. Onge Body Cam 2130), 4 min., 9 sec. to 4 min., 20 sec. The officers took Mr. Espinoza to the Moses Lake police station, where he was placed in a holding cell.

Detective Brian Jones spoke with Ms. Perez that afternoon, just before she was released from the hospital. Officer St. Onge was present and the interview was recorded on his body camera. During the interview, Ms. Perez told the detective she had been cleaning and did not know what happened. At the time, she and "Paco" (the name she used for Mr. Espinoza) were the only ones in the house. Through tears at times, Ms. Perez explained Mr. Espinoza was in front of her, bent over picking up clothes or something, and she could not move past him because he was in the way; all she knew was there was a loud noise and her back started hurting. She said she had not been paying attention to what Mr. Espinoza was doing; they were angry with each other. When the detective asked her whether she had ever suffered any domestic violence from him, she was emphatic that he had never been violent toward her.

5

Asked whether Mr. Espinoza possessed or had possessed a gun, she acknowledged that he had one before he went to jail about a month earlier. She did not know where he kept it. Although apparently not knowledgeable about guns, she tried to be cooperative as Detective Jones asked questions about the type of gun and its features. As he pressed her about the gun, she interjected at one point, "I really don't think it was him. I don't see *how*, you know . . . ," and the detective assured her that shootings can happen as "an accident . . . a lot." Ex. 51, at 8 min., .00 sec. to 8 min., 10 sec. When the detective's questions implied that Mr. Espinoza did something with a gun after she was shot, Ms. Perez appeared to offer another possibility, volunteering that her friend Brittney and Brittney's friend Bandit left through the front door moments before she was shot, and she did not know Bandit. She said the front door had remained open and Brittney and Bandit left in separate directions.

After interviewing Ms. Perez, Detective Jones traveled to the police station to interview Mr. Espinoza. Throughout the interview Mr. Espinoza insisted he did not know what happened. At one point, Detective Jones told Mr. Espinoza he seemed "a little manic" or "amped up" and Mr. Espinoza said it was because he was angry, and he should not be there. Ex. 3, at 13 min., .00 sec. to 13 min., 25 sec. Officers had obtained a search warrant for the Espinoza/Perez home, and Detective Jones mentioned that a methamphetamine pipe was found in the living room. Detective Jones asked about its use and Mr. Espinoza deflected his questions. When asked whether a drug test of him at

6

that point would be positive, Mr. Espinoza initially said no, but when the detective said that the Department of Corrections would probably test him, he said it probably would be.

A search warrant was obtained for Mr. Espinoza's car in addition to the warrant to search the home, and no firearm was found in either place. Surveillance video from security cameras on the exterior of the home was recovered, from which officers determined that Mr. Espinoza returned to his home after initially taking Ms. Perez to the hospital and went inside for 58 to 59 seconds before coming out and returning to the hospital. Going into the home, Mr. Espinoza did not appear to be carrying anything; on coming out and returning to his car, he appeared to be carrying a black object in his right hand.

The surveillance video revealed that Ms. Perez's friends Brittney and Bandit had left shortly before Mr. Espinoza and Ms. Perez were seen "tumbling" out of the house with Ms. Perez obviously injured and bleeding. RP at 534-35.

Detective Aaron Hintz concluded that Ms. Perez was shot in her and Mr. Espinoza's bedroom based on what he concluded was a bullet hole in the ceiling in that room—the only bullet hole found—and a substantial amount of blood just outside of the bedroom. He surmised that the bullet went through the ceiling and into the attic, but he did not find a bullet in the attic. Detective Hintz determined the bullet was fired from

inside the room, up against the wall between the bed and a laundry basket. A 9 mm shell was found in the laundry basket.

Dr. Kovar concluded from his examination that the bullet had entered Ms. Perez's body on the lower side of her right posterior shoulder blade and exited slightly higher on her back, between her left shoulder blade and spine. From the size of the wound, it was his opinion that the bullet was fired from a pistol, 9 mm or smaller. From the appearance of the entrance wound, the gun was not in direct contact with her body. It was Dr. Kovar's opinion that it was probably a few feet away or possibly farther.

Mr. Espinoza was charged with third degree assault against a family or household member while armed with a firearm and with first degree unlawful possession of a firearm. The State later amended the charges to include two counts of witness tampering based on phone calls made by Mr. Espinoza to Ms. Perez while he was in jail.[1] During the conversations, Mr. Espinoza told Ms. Perez not to let the police find her and not to listen to them.

Among the evidence presented at trial was the body camera video and a redacted videotape of Detective Jones's interview of Mr. Espinoza at the police station. Hospital admitting clerks Monk and Jensen testified, as did a number of the officers involved and the ER physician who treated Ms. Perez.

---

[1] The State also added a charge of possession of a controlled substance (heroin) but it voluntarily dismissed that charge at trial.

Mr. Espinoza testified on his own behalf.  He testified that on the day Ms. Perez was shot, Brittney and her friend Bandit had visited and Ms. Perez fed them breakfast.  While they were there, Mr. Espinoza said something that made Ms. Perez upset, so he went outside and smoked a cigarette.  He then came back inside and started doing some cleaning.  He was in their bedroom stripping the bed when he heard Ms. Perez say goodbye to Brittney.  Ms. Perez entered the room as he leaned over to throw a comforter from the floor into the hallway.  While bent over, he heard a pop and wondered what it was.  He looked at Ms. Perez and saw that blood was staining her shoulder.  He tried to keep her calm and picked her up but fell on the steps as he took her down the steps.  He drove as fast as he could to Samaritan Hospital, where he parked in the wrong place and entered the wrong door, but the security guard helped direct him to the emergency room.

After he left Ms. Perez with the ER staff, he ran back to his car and drove home, because he had left the front door open and did not live in a very safe area.  He grabbed his cell phone and wallet and drove back to the hospital, where he spoke to the admitting clerk.  Asked about Ms. Monk's testimony that he told her he shot Ms. Perez, Mr. Espinoza testified, "Yeah, I don't know where that came from," and "I said maybe four words to this lady," explaining that he had been more focused on trying to call Ms. Perez's friend and father and his son.  RP at 574-75.

He denied shooting Ms. Perez or possessing a handgun on the day of the shooting.  He testified that when he spoke to Officers St. Onge and Alejo he tried to be clear about

9

what had happened, but he "might have mis-said something." RP at 576. He said he was dehydrated, explaining, "I'm a pretty heavyweight guy, and that was real hot, and I'm a pretty big dude, and she's not a very light person either." *Id.* He testified that he had weighed "about 357 pounds" at the time. *Id.* He testified that the hole in the ceiling that Detective Hintz concluded was a bullet hole had been created by a hook for a later-removed hanging plant.

In closing argument, the prosecutor suggested to jurors that Mr. Espinoza used his trip home from the hospital to get rid of his handgun and argued they could conclude from the fact that the shot was fired that Mr. Espinoza had not been following handgun safety rules. Defense counsel emphasized the body camera recordings during closing, telling jurors they could see that Mr. Espinoza had been cooperative with the officers and, when he was detained, asked what he was charged with. Defense counsel used and concluded with a theme that the presumption of innocence and the State's burden of proof beyond a reasonable doubt required that jurors give Mr. Espinoza "the benefit of the doubt." RP at 704, *and see* RP at 697-98.

The prosecutor responded at the outset of rebuttal argument:

> So nothing in the jury instructions instructs you to accord him the benefit of the doubt. It's did the state prove the case beyond a reasonable doubt?
>
> So it's important to ignore everything defense counsel says and everything that I say that's not supported by evidence presented to you.

RP at 705. The defense did not object. As he approached the conclusion of his

argument, the prosecutor said:

> So there's no possible other way that this occurred other than Mr.
> Espinoza shooting Ms. Perez. There's no other way. And this isn't about
> affording anybody the benefit of the doubt. There's no other way, it's
> beyond a reasonable doubt.

RP at 709. The defense did not object.

Mr. Espinoza was found guilty as charged. He appeals.

ANALYSIS

Mr. Espinoza makes four assignments of error, the fourth of which—a scrivener's

error in the judgment and sentence—is conceded by the State. Of the remaining three,

we first address Mr. Espinoza's challenge to his witness tampering convictions on

unanimity/sufficiency grounds. We then turn to his arguments that the State committed

prosecutorial misconduct by telling jurors that Mr. Espinoza was not entitled to the

benefit of the doubt or, alternatively, that his trial lawyer provided ineffective assistance

of counsel by failing to object to the improper closing argument.

I.   SUFFICIENT EVIDENCE SUPPORTED THE MEANS OF TAMPERING WITH A WITNESS ON
     WHICH THE JURY WAS INSTRUCTED

A person is guilty of tampering with a witness under RCW 9A.72.120(1) if he or

she attempts to induce a witness or person he or she

> has reason to believe is about to be called as a witness in any official
> proceeding or a person whom he or she has reason to believe may have

information relevant to a criminal investigation or the abuse or neglect of a minor child to:

(a) Testify falsely or, without right or privilege to do so, to withhold any testimony; or

(b) Absent himself or herself from such proceedings; or

(c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation or the abuse or neglect of a minor child to the agency.

Counts 4 and 5 of the State's amended information charged Mr. Espinoza with tampering with a witness on or about September 4 and 17, 2019, respectively, in all of the ways identified by the statute.

The court's elements instructions to the jury for counts 4 and 5 made no reference to tampering by testifying falsely, however. Instruction 21, the elements instruction for count 4, described the ways in which Mr. Espinoza was alleged to have tampered with a witness as follows:

> (1) That on or about September 4, 2019, the defendant attempted to induce a person to *withhold any testimony* or *absent herself from any official proceedings or withhold from a law enforcement agency information which she has relevant to a criminal investigation.*

Clerk's Papers (CP) at 193 (emphasis added). Instruction 22, the elements instruction for count 5, was identical in every respect except for its reference to a date "on or about September 17, 2019." CP at 194. The defense did not object to instructions 21 or 22. It did not request that "withhold any testimony" be defined.

12

Mr. Espinoza contends that witness tampering is an alternative means crime, that "withhold any testimony" is a means, and that the State did not present evidence that Mr. Espinoza induced Ms. Perez to "withhold any testimony."

If a statute describes distinct acts that amount to the same crime, it is referred to as an alternative means crime. *State v. Peterson*, 168 Wn.2d 763, 770, 230 P.3d 588 (2010). Washington precedent addressing alternative means crimes requires that a jury be unanimous as to the means, but only when a general verdict raises due process concerns because one or more of the alternatives presented to the jury are not supported by sufficient evidence. *State v. Woodlyn*, 188 Wn.2d 157, 165, 392 P.3d 1062 (2017).

No Washington decision is cited by Mr. Espinoza in which the court has examined and held that witness tampering under RCW 9A.72.120 *is* an alternative means crime. Mr. Espinoza cites *State v. Lobe*, 140 Wn. App. 897, 902-03, 167 P.3d 627 (2007), which assumed that witness tampering is an alternative means crime. *State v. Witherspoon*, 171 Wn. App. 271, 286 P.3d 996 (2012), *aff'd*, 180 Wn.2d 875, 329 P.3d 888 (2014), made a similar assumption. In both of those decisions, however, the State did not need to argue the point because it could rely on an easily-met but now-debunked harmless error analysis: if the State's evidence was insufficient as to a means, then presumably the jury did not rely on that means. Until our Supreme Court decisively rejected that application of harmless error in *Woodlyn*, 188 Wn.2d at 165-66, the State had little incentive to argue that the subsections of RCW 9A.72.120(1) were merely facets of the same criminal

13

conduct.[2]  Whether witness tampering is an alternative means crime might bear

examination in some future case, but the State does not address the issue in responding.

Because it does not matter to our decision, we assume, without deciding, that it is.

The State responds to this assigned error by arguing that there *was* sufficient

evidence from which the jury could find, as required by the elements instructions, that on

September 4 and 17 "the defendant attempted to induce a person to withhold any

testimony."  The State relied on the following conversation of September 4:

> Female:  I'll put money in your books today.
> Inmate:  *I just don't want them to find you, eh.*
> Female:  What?  Dude.
> Inmate:  *Don't let them find you* because they are going to put an arrest
> warrant to find you and everything.  They're going to put a warrant and
> everything for you.  I need you to.
> Inmate:  Okay?
> Female:  Why?
> Inmate:  *Because without you they don't have a case.  You get me?  If you
> don't come to court they can't charge me with anything.*
> . . . .
> Inmate:  *Don't be out in the streets too much so they won't find you.*
> . . . .
> Female:  That's scary.  I don't want to do that, that's scary.
> Inmate:  I love you babe, ok.

---

[2] "The more varied the criminal conduct, the more likely the statute describes
alternative means.  But when the statute describes minor nuances inhering in the same
act, the more likely the various 'alternatives' are merely facets of the same criminal
conduct."  *State v. Sandholm*, 184 Wn.2d 726, 734, 364 P.3d 87 (2015).  "The mere use
of a disjunctive in a statute does not an alternative means crime make."  *Peterson*, 168
Wn.2d at 770.  "Nor has it been found that structuring the statute into subsections is
dispositive or that definitional statutes create alternative means."  *Sandholm*, 184 Wn.2d
at 734 (citing *State v. Lindsey*, 177 Wn. App. 233, 241, 311 P.3d 61 (2013)).

Br. of Appellant, App. A at 4-5 (Ex. 49) (emphasis added).

It relied on the following conversation of September 17:

Female:  Hey.
Inmate:  Did you calm her?
Female:  Yes.
Inmate:  Poor baby, why is she crying?
Female:  Ah, because we are leaving the *unintelligible.
. . . .
Inmate:  Hey dude don't say anymore of that stuff on the phone, dude about what you told me when you answered, and *send them to hell dude. Don't go, dude*.
Female:  Ok.
Inmate:  And now, *disappear for a little while*.
Female:  Ahm, well they told me, ahm.
Inmate:  Ha?
Female:  Said that, ahm, it was nothing bad they just wanted to talk.
Inmate:  *It's not true babe, don't listen to them, send them to hell.*
Female:  They wanted to sit down and discuss what we, what they want to do.
Inmate:  *No, send them to hell. Okay? You hear me?*
Female:  Yes.
Inmate:  But listen to me. Are you (unintelligible) from the credit card? Don't lie to me.

Br. of Appellant, App. B at 3-4 (Ex. 50) (emphasis added).

The State argues that telling Ms. Perez on September 4 not to let police find her because the only way the State could make its case against him was if she came to court was an inducement to withhold testimony. It argues that telling her on September 17 to disappear for a while and not listen to people who wanted her to cooperate was likewise an inducement to withhold testimony. It argues this was sufficient evidence from which the jury could infer an inducement to withhold testimony.

The State's argument is persuasive.  When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.  *Id.*

Applying the plain meaning of "withhold," one could "withhold . . . testimony" by making oneself unavailable.  As relevant here, "withhold" is defined to mean:

> **1 :** to hold back **:** keep from action **:** CHECK, RESTRAIN <frequent bursts of grief . . . obliged her, at intervals, to ~ her pen —Jane Austen> **2 :** to desist or refrain from granting, giving, or allowing **:** keep in one's possession or control **:** keep back <distribute among the youngsters all blankets and provisions and gear, ~*ing* for myself only a canteen —Hodding Carter> <~ permission>.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2627 (1993) (alteration in original).

Anticipating this response from the State, Mr. Espinoza contends that the State cannot advance a meaning for "withhold any testimony" as used in subsection (a) of RCW 9A.72.120(1) that encompasses absenting oneself from proceedings, because "[a]bsent[ing oneself] from . . . proceedings" constitutes witness tampering under RCW 9A.72.120(1)(b).  He argues that a rule of statutory construction "requires courts, whenever possible, to give effect to every word in a statute, leaving no part superfluous." Br. of Appellant at 21 (citing *Cox v. Helenius*, 103 Wn.2d 383, 387-88, 693 P.2d 683

16

(1985)). Since RCW 9A.72.120(1)(a) states in full "[t]estify falsely or, without right or privilege to do so, to withhold any testimony," Mr. Espinoza argues that considered in its statutory context, "inducing the withholding of testimony refers to *inducing testimony that is false by way of omission*." Br. of Appellant at 21 (emphasis added).

If "withhold any testimony" is a statutory means that, properly defined, means "inducing testimony that is false by way of omission," then the trial court's instructions 21 and 22 have one of two shortcomings. The first possible shortcoming is that the instructions include a means of committing witness tampering—"withhold any testimony" as *commonly understood*—that is not a statutory means. Our review of this first assignment of error by Mr. Espinoza is *sufficiency* review of the means on which the jury was instructed, however. Among the facets of Washington's "law of the case" doctrine is the "'principle that jury instructions that are not objected to are treated as the properly applicable law for purposes of appeal.'" *State v. Johnson*, 188 Wn.2d 742, 755, 399 P.3d 507 (2017) (quoting *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005)). If an elements instruction states the law in a manner that does not describe a crime, it is constitutionally defective and a conviction based on the instruction must be reversed. *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). But Mr. Espinoza does not contend that the witness tampering elements instruction did not describe a crime; he concedes that it describes, and the evidence was sufficient to prove, witness tampering under RCW 9A.72.120(1)(b) and (c). His only argument is that it does not

accurately describe what he contends is the means made criminal by RCW

9A.72.120(1)(a).

The second possible shortcoming is that the instructions include the statutory

means, "withhold any testimony," but fail to provide the technical meaning of that term

that Mr. Espinoza argues is required after applying rules of statutory interpretation to

RCW 9A.72.120(1) as a whole. "A term is 'technical' when it has a meaning that differs

from common usage." *State v. Brown*, 132 Wn.2d 529, 611, 940 P.2d 546 (1997).

If Mr. Espinoza believed that "withhold any testimony" as used in RCW

9A.72.120(1)(a) has a technical meaning narrower than suggested by that plain, stand-

alone language, he should have proposed a jury instruction that conveyed that narrower

meaning.[3] RAP 2.5(a) states the general rule for appellate disposition of issues not raised

in the trial court: appellate courts will not entertain them. *State v. Scott*, 110 Wn.2d 682,

685, 757 P.2d 492 (1988). CrR 6.15(c) requires that timely and well-stated objections be

made to jury instructions given or refused in order that the trial court may have the

opportunity to correct any error. *City of Seattle v. Rainwater*, 86 Wn.2d 567, 570-71,

---

[3] We are not suggesting that the narrower meaning is the correct one. "[R]ules or maxims of statutory interpretation should be recognized and treated as nothing more than aids or tools which may or may not be pertinent or useful in determining the meaning of statutory language. There is nothing mandatory about the applicability of a rule of statutory interpretation. . . ." *Schneider v. Forcier*, 67 Wn.2d 161, 167, 406 P.2d 935 (1965) (Finley, J., dissenting). In crafting language about action that constitutes a crime, the legislature might use overlapping language to prevent evasion.

546 P.2d 450 (1976). The failure to define a technical term in a jury instruction is not constitutional error that can be raised for the first time on appeal. *Scott*, 110 Wn.2d at 690; *see also State v. Daniels*, 87 Wn. App. 149, 156, 940 P.2d 690 (1997) (if defendant was worried that jurors could understand an undefined term to mean what it means in some other form of a charged crime, he should have asked for a definitional instruction); *State v. Ng*, 110 Wn.2d 32, 44, 750 P.2d 632 (1988) (failure to define "theft" as used in a robbery instruction was not a matter of constitutional consequence).

The two cases relied on by the dissent do not hold otherwise. *State v. Owens*, 180 Wn.2d 90, 323 P.3d 1030 (2014), merely holds that to determine whether a statute creates an alternative means crime, we engage in statutory interpretation. We agree. In *State v. Sweany*, the second case relied on by the dissent, there *was* no technical term: the plain meaning of the jury instruction conformed to the plain meaning of the statutory means. 174 Wn.2d 909, 915-16, 281 P.3d 305 (2012) (meaning arrived at by the court was the term's "natural reading," "only logical" interpretation, and was "consistent with the dictionary definition"). In interpreting the meaning of "valued at" in the statute, the court was construing how it was understood by the jury at the same time.

If there is no objection to a jury instruction, the due process concern presented by a unanimity/sufficiency challenge is satisfied if the jury was presented with substantial evidence of the element as identified for the jury. In that case, we do not measure the

trial evidence against statutory language that the jury did not see, interpreted according to a rule that the jury was never told about. The evidence was sufficient.

II.      PROSECUTORIAL MISCONDUCT IS NOT SHOWN, BUT INEFFECTIVE ASSISTANCE OF
         COUNSEL IS, AT LEAST AS TO COUNT 1

Mr. Espinoza contends that the prosecutor's statements about the burden of proof and the presumption of innocence during closing argument constituted prosecutorial misconduct and his attorney's failure to object amounted to ineffective assistance of counsel. He argues that either error requires reversal of his convictions for count 1 and count 2.

Count 1 charged Mr. Espinoza with assault in the third degree under RCW 9A.36.031(1)(d), under which a party is guilty if, under circumstances not amounting to first or second degree assault, the person "[w]ith criminal negligence, causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm." The jury was properly instructed:

> A person is criminally negligent or acts with criminal negligence when he fails to be aware of a substantial risk that bodily harm may occur and this failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

CP at 186; *see* RCW 9A.08.010(1)(d).

Count 2 charged Mr. Espinoza with first degree unlawful possession of a firearm, which the jury was instructed is committed when the person has previously been convicted of a serious offense and knowingly owns or has in his possession or control

20

any firearm.  Mr. Espinoza stipulated that he had previously been convicted of a serious

offense.

*Prosecutorial misconduct*

To succeed on a prosecutorial misconduct claim, an appellant has the burden of

establishing that the prosecutor's conduct was improper (as being at least mistaken) and

was prejudicial.  *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997).  When

a defendant fails to object in the trial court to a prosecutor's statements, he waives his

right to raise a challenge on appeal unless the remark was so flagrant and ill intentioned

that it evinced an enduring and resulting prejudice that could not have been neutralized

by an admonition to the jury.  *Id*. at 719.

Our Supreme Court has previously held that arguing that a criminal defendant is

not entitled to the benefit of the doubt is "clearly improper."  *State v. Warren*, 165 Wn.2d

17, 24, 195 P.3d 940 (2008).  In that case the prosecutor told jurors during her rebuttal

closing:

- that for the defense "to ask you to infer everything to the benefit of the defendant is not reasonable;"
- that "[r]easonable doubt does not mean give the defendant the benefit of the doubt, and that is clear when you read the definition;" and that
- "Finally, in this case I want to point out that this entire trial has been a search for the truth.  And it is not a search for doubt.  I talked to you about the fact that you must find the defendant guilty beyond a reasonable doubt.  That is the standard to be applied in the defendant's case, the same as any other case.  But reasonable doubt does not mean beyond all doubt and it doesn't mean, as the defense wants you to believe, that you give the defendant the benefit of the doubt."

21

*Id.* at 24-25.

The defense objected to the first comment and was overruled. *Id.* at 24. But after the third comment, the court read the jury a portion of the reasonable doubt instruction and provided a further explanation that we quote in part:

> [A]fter you have reviewed all of the evidence or lack of evidence, and you continue to have a reasonable doubt then you must find the defendant not guilty. *And if in still having a reasonable doubt that is a benefit to the defendant, then in a sense you are giving the benefit of the doubt to the defendant.*
>
> *So I don't want you to misconstrue the language that somehow there is no benefit here. Indeed there is, because the benefit of the doubt is if you still have a doubt after having heard all of the evidence and lack of evidence, if you still have a doubt, then the benefit of that doubt goes to the defendant, and the defendant is not guilty.*
>
> So we are playing with words here in a sense. The instruction is here in the package. I commend it to you for your reading.

*Id.* at 25 (emphasis added).

While finding the argument clearly improper, the court concluded that the error was cured because defense counsel objected and the trial judge gave "a correct and thorough curative instruction." *Id*. at 28. The court noted, "Had the trial judge not intervened to give an appropriate and effective curative instruction, we would not hesitate to conclude that such a remarkable misstatement of the law by a prosecutor constitutes reversible error." *Id.*

The State concedes in this case, as it must, that the prosecutor's comments were improper. Yet because Mr. Espinoza failed to object, he must show that a curative

22

instruction could not have cured the prejudice.  *Warren* establishes that instruction *can*

cure the prejudice from this sort of problematic argument.

        *Ineffective assistance of counsel*

        Alternatively, Mr. Espinoza argues that it was ineffective assistance of counsel for

his trial lawyer not to object and obtain a curative instruction.  To prevail on a claim of

ineffective assistance of counsel, a defendant must demonstrate (1) that defense counsel's

representation was deficient, i.e., it fell below an objective standard of reasonableness;

and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a

reasonable probability that, except for counsel's unprofessional errors, the result of the

proceeding would have been different.  *State v. McFarland*, 127 Wn.2d 322, 334-35,

899 P.2d 1251 (1995).

        The State concedes that defense counsel's failure to object amounts to deficient

performance.  The concession is reasonable.  Not only did our Supreme Court find the

same argument improper in *Warren*, but giving a criminal defendant the "benefit of the

doubt" is accepted as a way to explain the concept of reasonable doubt.  *See, e.g.*, *Victor*

*v. Nebraska*, 511 U.S. 1, 26-27, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); FED.

JUDICIAL CTR., PATTERN CRIMINAL JURY INSTRUCTIONS instr. 21 (1988) ("Definition of

Reasonable Doubt"); MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF

THE THIRD CIRCUIT 4.13.1 ("Section 1983 – Burdens of Proof in Civil and Criminal

Cases") (2019). There was no reason for defense counsel to fail to make an objection and request a curative instruction.

The State argues that Mr. Espinoza was not prejudiced by the improper argument because the evidence against him was "overwhelming." Br. of Resp't at 23. With respect to the third degree assault conviction with its firearm enhancement, however, we disagree.

The State relies heavily on the testimony of Ms. Monk and Ms. Jensen that Mr. Espinoza admitted shooting Ms. Perez, but their testimony was contradicted by other evidence. Ms. Jensen's testimony that Mr. Espinoza admitted accidentally firing his gun in the kitchen was inconsistent with all the other evidence in the case; it was inconsistent with Mr. Espinoza's testimony, Ms. Perez's testimony, the blood evidence, the absence of any bullet hole in the kitchen, and law enforcement's assessment of where the shot was fired. Two police officers standing nearby never heard Mr. Espinoza say what the admitting clerks claim they heard. The clerks acknowledged that Mr. Espinoza was "erratic," "stumbling with words," and uttering "a lot of scrambled speech." RP at 192, 209. Jurors could see for themselves on the body camera video that he was upset and agitated.

The State further relies on the evidence that Mr. Espinoza and Ms. Perez were the only persons present in the home. That, and Ms. Perez's statements to Detective Jones that Mr. Espinoza had recently been in possession of a handgun satisfies us that there is

no reasonable probability that the jury would have decided the possession of a firearm count differently. But the fact that they were the only two individuals in the house says nothing about whether the shooting could have been not only an accident, but nonnegligent.

Finally, the State relies on an argument that Mr. Espinoza was high on drugs when Ms. Perez was shot. While witnesses agreed that he was agitated, however, they ascribed it differently. Dr. Kovar, for instance, characterized Mr. Espinoza as "obviously very upset and concerned." RP at 460. And while the trial court allowed some evidence of drug paraphernalia found in the home to be admitted subject to a limiting instruction that it was relevant only to negligence,[4] the court itself commented outside the presence of the jury that there was no medical evidence Mr. Espinoza was high and his behavior might be explained by the stress of the situation.

There is a reasonable probability that the verdict on the third degree assault count would have been different if defense counsel had objected to the prosecutor's improper argument and obtained a curative instruction. That conviction must be reversed.

III.    SCRIVENER'S ERROR

The parties agree that the judgment and sentence states, in error, that the firearm enhancement imposed relates to count 2 rather than count 1. Correction is required.

---

[4] The court instructed the jury that "evidence has been presented that there was drug paraphernalia in the home. This evidence may only be considered for the limited purpose of whether or not the defendant acted negligently." RP at 659.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds, Mr. Espinoza raises one: he challenges the sufficiency of the evidence that he possessed a firearm as required for count 2.

No witness testified that Mr. Espinoza was seen with a firearm on or about the date charged, and no firearm was found in a search of his home or car. But Ms. Perez said when interviewed that Mr. Espinoza had been in possession of a firearm approximately a month earlier. She was shot in her home when only she and Mr. Espinoza were present. A 9 mm shell was found near where she was shot, and her attending ER physician testified, based on her wounds, that the bullet that had passed through her torso was fired by a 9 mm or smaller pistol. The firearm she described as having been in Mr. Espinoza's possession was consistent with her wounds and with the shell. Ms. Monk and Ms. Jensen testified that Mr. Espinoza said he shot Ms. Perez. As argued by the State, it was possible that Mr. Espinoza had an opportunity to retrieve and dispose of a firearm when he briefly returned home from the hospital.

Direct and circumstantial evidence are equally reliable, and we "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009). The evidence was sufficient.

We reverse Mr. Espinoza's conviction for count 1 and the associated firearm enhancement. We remand for resentencing and for further proceedings consistent with

No. 37390-8-III
*State v. Espinoza*

this opinion including, at the State's option, a retrial of the third degree assault charge

with its firearm enhancement.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Pennell, C.J.

No. 37390-8-III

STAAB, J. (Dissenting) — While I agree with the majority on the issue of prosecutorial misconduct and ineffective assistance of counsel, I disagree on the alternative means issue. In my opinion, the majority reaches a conclusion that is contrary to precedent and the statutory language.

On appeal, Jose Espinoza argues that the State presented insufficient evidence on each of the three alternative means of committing witness tampering that were presented to the jury. The State acknowledges that the crime of witness tampering is an alternative means crime and that there are three alternative means: "(1) testify falsely or withhold testimony, (2) absent himself or herself from an official proceeding, or (3) withhold information from a law enforcement agency." *State v. Andrews*, 172 Wn. App. 703, 707, 293 P.3d 1203 (2013); *State v. Lobe*, 140 Wn. App. 897, 902-03, 167 P.3d 627 (2007), RCW 9A.72.120(1)(a)-(c). Mr. Espinoza was charged, and the jury was instructed on all three alternatives.

While the State presented the trial court with to-convict jury instructions that included all three means, the proposed instructions shortened the first means to simply "withholding any testimony." Since the State did not seek a unanimity jury instruction, there must be sufficient evidence to support each of the three alternative means. *State v.*

*Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). Mr. Espinoza argues that the statutory

term "withholding testimony" needs to mean more than absenting oneself from the trial

to avoid redundancy. The State disagrees and contends that it presented sufficient

evidence that Espinoza attempted to induce another to withhold her testimony by telling

her to disappear and not come to court.

The majority finds sufficient evidence to support the alternative means as outlined

in the jury instructions. To reach this conclusion, the majority notes that the due process

concern with sufficiency of the evidence in an alternative means crime is jury unanimity

and whether the alternative means presented to the jury were supported by evidence. In

other words, the issue is not strictly sufficiency of the evidence since the defendant

acknowledges there is sufficient evidence to support two of the three alternatives.

Instead, the question is whether a jury presented with alternative means of committing a

crime could find evidence to support each alternative. To this effect, the majority

concludes that terms used within an alternative means statute, when not explicitly defined

in the jury instructions, can be given their ordinary meaning, even if the statute would

require a narrower definition. While I understand the majority's reasoning, I disagree

because there is no precedent to support this position. Indeed, the majority does not cite

any authority to support its conclusion. Instead, several Supreme Court cases clarify that

defining terms within an alternative means crimes is a statutory interpretation issue, not a

jury instruction interpretation issue.

In *State v. Sweany*, the Supreme Court addressed the sufficiency of evidence for the alternative means crime of first degree arson. 174 Wn.2d 909, 914, 281 P.3d 305 (2012). The defendant argued that the evidence was insufficient to support the alternative means of causing a fire on property "valued at" ten thousand dollars or more. To determine the definition of the term "valued at," the court applied rules of statutory construction including the term's use in context of the statute as a whole. *Id*. at 914-15. The court found that a more "natural reading of the statute" would define the term "valued at" as referring to the market value. *Id*. at 915. The court then applied this statutory definition and found the evidence sufficient under the alternate means. *Id*. at 917-18.

Similarly, in *Owens*, the Supreme Court was asked to consider whether there was sufficient evidence to support the alternative means of trafficking in stolen property. In doing so, the court noted: "The first issue is whether [the statute] is an alternative means crime and, if so, what those alternative means are. *This presents an issue of statutory interpretation*." *Owens*, 180 Wn.2d at 96 (emphasis added). The court went on to determine the statute's alternative means by employing rules of statutory construction. *Id*. at 96-97. After defining the two alternative means of committing the crime, the Court considered the sufficiency of evidence to support each means by applying the language of the statute to the evidence at trial. In rejecting the defendant's argument on the

sufficiency of evidence to support an alternative means, the court noted that it was "not supported by the statutory language." *Id*. at 100.

In this case, the majority holds that since the jury was not provided with the entire context of the statute's first alternative means or a definition, the jury was free to apply an ordinary meaning even if that meaning would be broader than the term's definition under statutory interpretation. The majority cites no authority for this position.

Mr. Espinoza does not claim that the jury instructions misstate the law or inaccurately describe the first means of committing the crime. Instead, he contends that the first alternative set forth in the instructions is the same alternative set forth in the statute, albeit shorter. While shortening the first means in the jury instruction removed statutory context, it does not change the meaning of the term. The State only included the bracketed language of the first alternative on withholding testimony, believing that withholding testimony is the same as encouraging someone to disappear and not testify at all.

The jury instructions accurately reflected the statute. Indeed, this shortened version of the to-convict instruction is supported by the pattern jury instructions, which instructs attorneys to use the bracketed language as applicable. 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 115.81 note on use at 492 (4th ed. 2016). Therefore, in determining whether sufficient evidence supports each

4

alternative means as set forth in the instructions, terms used in the instructions should be given the same meaning as identical terms used in the statute.

This is a statutory construction issue. In construing the meaning of terms used in a statute, our goal is to ascertain and give meaning to the legislature's intent. *Sweany*, 174 Wn.2d at 914. The best indication of legislative intent is the plain language of the statute, the context in which the provision is found, related provisions, and the statute as a whole. *Id*. at 914-15. In considering the statute as a whole, the court should avoid an interpretation that would render any part inoperative or superfluous. *In re Det. of Strand*, 167 Wn.2d 180, 189, 217 P.3d 1159 (2009).

The first alternative means of committing witness tampering includes inducing a witness to "(a) [t]estify falsely, or without right or privilege to do so, to withhold any testimony." RCW 9A.72.120(1)(A). While the second alternative prohibits inducing a witness to "(b) [a]bsent himself or herself from such proceedings." RCW 9A.72.120(1)(b). Considering the context of the first alternative, it is clear that "withholding testimony" means getting on the stand as a witness and either refusing to answer or failing to give the whole truth. The modifier "without right or privilege to do so" would apply if a witness had a valid reason for refusing to answer, such as a right under the Fifth Amendment to the United States Constitution. It is also clear from the context of phrases and the statute as a whole that absenting oneself from a proceeding is

5

different than withholding testimony.  If the second alternative subsumed the first

alternative, then the first alternative would be superfluous.

In this case, since the State failed to present any evidence that Mr. Espinoza

induced another to withhold testimony, i.e. appear in court but refuse to answer questions

or provide the whole truth, there is insufficient evidence to support the first means of

witness tampering as provided to the jury.  Because the evidence is insufficient to support

the first alternative means, and the jury did not provide a particularized expression of

unanimity as to which of the means it relied on, I would reverse Mr. Espinoza's

conviction for witness tampering without prejudice.

_____
Staab, J.